UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

B&P LITTLEFORD, LLC,

      Plaintiff/Counter-Defendant,

v.

PRESCOTT MACHINE, LLC, and
RAY MILLER

      Defendants/Counter-Plaintiffs.

Case No. 25-cv-13348

Honorable Robert J. White

**OPINION AND ORDER DENYING
PLAINTIFF/COUNTERDEFENDANT'S MOTION FOR PRELIMINARY
INJUNCTION (ECF Nos. 26; 27)**

Plaintiff B&P Littleford (B&P) designs and builds industrial equipment and produces technical drawings of the product designs to preserve their work product. B&P safeguards these technical drawings with copyright protections and nondisclosure agreements. Its former president, Defendant Ray Miller, was terminated by B&P in 2008 and later formed Defendant Prescott Machine, LLC (Prescott), which led to two rounds of litigation over Prescott's alleged misuse of B&P's proprietary drawings. Both cases were settled in 2022.

B&P now claims that Prescott and Miller continue to use drawings substantially similar to—and derived from—some of B&P's copyrighted drawings.

As a result, B&P sued Prescott and Miller a third time on October 22, 2025. B&P then moved for a preliminary injunction, contending that Prescott and Miller are distributing infringing drawings to customers and vendors. B&P asserts that Prescott and Miller are competing with it for business in a particular bidding process and are likely to use an infringing drawing in that process. For the reasons explained below, B&P's motion for a preliminary injunction will be denied.

## I.     Background.

### A.     Prior Litigation.

For over one hundred years, B&P and its predecessors have "design[ed] and buil[t] industrial equipment," including "vertical planetary batch mixer[s]" used for "solid rocket fuel." *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *1, *3 (6th Cir. Aug. 24, 2021). B&P routinely "maintains drawings of individual parts as well as assembly drawings that show how the parts are put together." *Id.* at *1.  It also "imposes strict nondisclosure requirements," *id.*, and further safeguards many of these drawings with copyrights, ECF No. 1 at PageID.10.

Defendant Miller served as B&P's "president and CEO" for 17 years "from 1995 to 2008, when he was fired." *B&P Littleford, LLC*, 2021 WL 3732313, at *1. After B&P fired Miller, he created his own company, Prescott, to service and repair industrial equipment. *Id.* at *2. Ultimately, that led to two rounds of litigation concerning B&P's technical part drawings. *B&P Littleford, LLC v. Prescott Mach.,*

*LLC*, No. 1:20-CV-13025, 2022 WL 625069, at *1–3 (E.D. Mich. Mar. 3, 2022).

The first round of litigation began in 2018. *See B&P Littleford*, *LLC*, 2021 WL 3732313, at *4. In that case, B&P sued Prescott and Miller for misappropriating B&P's trade secrets to secure a contract to rebuild an industrial mixer for the United States Navy that B&P initially installed. *Id.* at *3–4. To that end, Prescott and Miller used twenty-seven of its protected-part drawings to fulfill the contract that Miller had obtained. *Id.* at *3.

The second round of litigation began in 2020. *B&P Littleford, LLC*, 2022 WL 625069, at *1. That case involved similar conduct—Prescott and Miller using B&P's part drawings to create unauthorized reproductions or derivative drawings. *Id.* But this time, B&P brought copyright infringement claims under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. §§ 1201 *et seq.*, and Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, which survived a motion to dismiss. *Id.* at *2–3.

In the end, in 2022, the parties settled both cases. *See* ECF No. 2-2. The settlement agreement required Miller to "destroy every copy of any of the B&P Drawings" in his "possession, custody, or exclusive control" and any other B&P documents that they possessed within forty-five days. *Id.* at PageID.246. With the same deadline, it also required Miller to "destroy every copy of any Covered Prescott Drawing"—essentially, derivative drawings that Prescott generated from B&P's

- 3 -

technical drawings—that they possessed.[1] *Id.* Moreover, it prohibited Prescott and Miller from "aquir[ing] or us[ing], or attempt[ing] to acquire or use, any of B&P's Drawings" without authorization from B&P. *Id.* at PageID.247.

In addition to the obligations it imposed on Prescott and Miller concerning technical drawings, the settlement agreement contained a confidentiality provision. That provision required the parties to remove anything that they had posted about the litigation "on [their] website[s] or otherwise," within thirty days of executing the settlement agreement. *Id.* at PageID.249. It further required the parties to refrain from disclosing the settlement agreement's contents to any third party beyond stating that the parties had "agreed to resolve the matter," with few exceptions. *Id.* The exceptions allowed the parties to disclose the settlement's details (1) "as required by law or order if court," or (2) "as necessary for a [p]arty to pursue an action to enforce" the settlement. *Id.*

### B.     This Case.

#### 1.     The Allegations and Claims.

B&P has launched a third case. B&P alleges that it "recently discovered from

---

[1] After executing the settlement agreement, Miller completed two affidavits certifying that he fully complied with their drawing-destruction mandates. *Id.* at PageID.292–95. At that time, B&P had the opportunity to conduct a forensic audit within thirty days of that certification to ensure that no covered drawings remained in Prescott and Miller's possession but elected not to do so.

two vendors" that Prescott is still using "design drawings that are derived from" its copyrighted drawings. ECF No. 1, PageID.2. It alleges that Prescott "is distributing and using at least one technical drawing that is derived from copyrights B&P blade design drawings for one of B&P's vertical mixers,"—a 150-gallon mixer—and a part "that is a near replica of B&P's lower gear housing design, which is depicted in the associated design drawings for the same [B&P]" mixer. *Id.*

As support for those allegations, B&P highlights several similarities between drawings depicting B&P's 150-gallon high- and low-speed mixer blade parts and Prescott's allegedly infringing drawings featuring its mixer blades. ECF No. 2, PageID.177–217. On that score, B&P points to parallels in the drawings' blade heads, blade shafts, and blade shaft subsections and keyways. *Id.* It also emphasizes near-identical and identical measurements and tolerance ranges across the drawings. *Id.* Finally, it asserts that although Prescott could have portrayed its drawings from a different angle, it used the same point of view as the B&P blade drawings. *Id.*

B&P further asserts that the similarities between its blade drawings and Prescott's, taken as a whole, are virtually impossible without Prescott and Miller having used B&P's drawings. ECF No. 1, PageID.66. That impossibility is due to the "unique combination of precise measurements of each piece of a mixer blade." *Id.* at PageID.44–45. And according to B&P, some of the similarly sketched components—like the blade shaft shape and its subparts' size—are "not necessary

to the functioning of the" blade. *Id.* at PageID.49.

Due to this alleged infringement, B&P filed a verified complaint against Prescott and Miller on October 21, 2025. *See* ECF Nos. 1; 2. B&P asserts four claims: a (1) direct copyright infringement claim under 17 U.S.C. § 501 against both Defendants; (2) vicarious liability claim against Miller; (3) contributory liability claim against Miller; and (4) breach-of-contract claim against both Defendants. ECF No. 2, PageID.225–34. Its infringement claims are confined to fourteen copyrighted blade-drawings for which it registered with the Copyright Office. *See* ECF No. 2, PageID.166–67; *see also Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301–02 (2019).

For their part, Prescott and Miller filed a countercomplaint, which they later amended. ECF No. 72. The amended countercomplaint goes on the defensive. It alleges that the relevant Prescott drawings were produced "without any reference to" B&P's drawings. *Id.* at PageID.2170. Rather, Prescott and Miller allege that they obtained a B&P mixer with an expired patent, disassembled it, reverse-engineered it, and created fresh models and drawings of its components. *Id.*

The amended countercomplaint also goes on the offensive. It asserts that, despite the settlement agreement's confidentiality provision, B&P disclosed settlement details to third parties, including during a legal malpractice lawsuit

against its former attorneys and a bid protest against the United States filed in the Federal Court of Claims on April 24, 2024. *Id.* at PageID.2168–69. Further, it alleges that B&P failed to timely remove postings on its website about the parties' prior litigation, breaching the settlement agreement at the outset. *Id.* at PageID.2167–68. And according to Prescott and Miller, B&P made false representations to vendors and customers "about Prescott's ability to lawfully manufacture a vertical mixer," and the source of its drawings. *Id.* at PageID.2171–77.

Based on those allegations, Prescott and Miller assert four counterclaims against B&P. They assert (1) a breach-of-contract claim founded on B&P's alleged violations of the Settlement Agreement's confidentiality provision; (2) a common-law unfair competition claim rooted in B&P's alleged "bad-faith representations of the scope of [its] intellectual property rights"; (3) a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a), based on those same representations; and (4) a copyright-misuse claim under 17 U.S.C. § 102(b), contending that B&P has unlawfully attempted to expand the scope of its copyright. *Id.* at PageID.2177–83.

### 2.    Preliminary Injunction Motion and Preliminary Record.

Against that backdrop, B&P moved for a preliminary injunction. It asserts that, absent immediate relief, it will suffer irreparable harm because Prescott and Miller are likely to use allegedly infringing drawings in an ongoing bidding process for a 150-gallon mixer. Prescott and Miller respond that the drawings at issue were

not derived from B&P's materials, pressing their reverse-engineering defense. They further contend that the elements B&P identifies are not protected by copyright and dispute B&P's claim of irreparable harm. At the Court's direction, the parties conducted expedited discovery and submitted supplemental briefing on the motion.

The evidentiary record includes excerpts from the deposition of Brian Fritz, B&P's Vice President of Engineering. *See* ECF No. 100-6. Fritz acknowledged that Prescott's drawings are not identical to B&P's, maintaining instead that they are substantially similar. *Id.* at PageID.2727, 2729, 2763. He further testified that the information reflected in B&P's drawings is used in, or at least relevant to, the manufacture of high- and low-speed blades. *Id.* at PageID.2734–35, 2737, 2742–43, 2746, 2749. And he expressed the view that B&P's copyrights extend to the blade drawings as a whole, rather than to discrete components. *Id.* at PageID.2752–64.

Miller and Sarah Bailey, Prescott's Vice President of Sales, were also deposed and submitted declarations. *See* ECF Nos. 54-2; 54-3; 100-10; 100-11; 104-14; 104-15. They state that, in 2022, Prescott destroyed all B&P drawings and related materials to comply with a prior settlement agreement, and Miller declared that "neither Prescott nor he has "had possession of" B&P drawings or derivatives of them since. ECF No. 54-2, PageID.1751. They further explain that Prescott acquired a 150-gallon vertical mixer originally developed in the 1960s by Baker Perkins, B&P's predecessor, and that any patent protection for that design has expired. *See,*

*e.g.*, ECF No. 54-3, PageID.1786; ECF No. 54-2, PageID.1752.

After securing a contract in 2023 to produce a 150-gallon vertical mixer, Prescott disassembled the 150-gallon Baker Perkins unit in January 2024 to reverse-engineer it. ECF No. 104-15, PageID.4346, 4352–73, 4376 (explaining in detail the disassembly process). According to Miller and Bailey, Prescott measured many of its parts—often rounding to the nearest common fractions, employing tracing techniques, and leveraging Miller's experience—using hand tools such as micrometers, tape measures, radius gauges, and digital calipers. *E.g.*, *id.* at PageID.4388–95. Prescott also engaged a third party to obtain data and measure certain gears that could not be assessed with hand tools alone. ECF Nos. 54-3, PageID.1786; 54-2, PageID.1753, 1760–69; 104-15, PageID.4401–17.

Beginning in mid-2024, Prescott used this information to create three-dimensional models of the mixer's components, including the blades. *See* ECF Nos. 104-15, PageID.4418; 54-3, PageID.1786–87. It then generated the two-dimensional drawings at issue from those models. As fabrication proceeded and designs were adjusted, Prescott revised both the models and drawings through an iterative "rework" process. *See* ECF Nos. 54-3, PageID.1787; 54-2, PageID.1756; 114-15, PageID.4437–38.

B&P, for its part, retained an expert to assess the plausibility of the reverse-

engineering process. *See* ECF No. 104-16. Assuming that files labeled "v1" were the initial versions of Prescott's blade models, the expert concluded that certain early iterations contained measurements identical to those in B&P's blade drawings. In his view, that result was improbable: the source mixer dated to 1963 and would be expected to exhibit wear and thermal variation; Prescott relied largely on hand tools; and certain welded components were not disassembled for direct measurement. From these premises, he reasoned that it was highly unlikely Prescott derived the identical dimensions through reverse engineering alone, and opined that the early models were likely created, at least in part, by reference to B&P materials or other sources containing B&P's dimensions. *Id.* at PageID.4624.

Prescott and Miller counter with their own expert. *See* ECF No. 100-9. That expert undertook a reverse-engineering exercise of a smaller mixer using similar methods—principally hand tools—and concluded that such an approach is feasible and consistent with industry practice. *Id.* at PageID.3005. He also identified several asserted deficiencies in B&P's analysis.

First, he observed that B&P's expert wrongly assumed that the Prescott CAD models that he reviewed were the first models, based on the file names. Properly understood, those models were not initial iterations, but versions that had already undergone many revisions before reaching the dimensions deemed suspect. *Id.* at PageID.3026–27, 3030. Second, he rejected the suggestion that reliance on hand

- 10 -

tools undermined the process, noting that such methods were likely employed in the mixer's original design. *Id.* at PageID.3032. In his experience, a reverse-engineering effort involving hand tools over multiple iterations and months aligns with standard engineering practice. *Id.* Third, he found little support for the asserted effects of age, observing that available images showed no substantial wear, that many measured components would not be subject to wear, and that any thermal expansion would be negligible. *Id.* at PageID.3020–22. Fourth, he explained that B&P's expert failed to account for Miller's experience and his practice of rounding measurements to common fractions—factors that would explain the identical dimensions between the blade drawings. *Id.* at PageID.3025–32.

The record does not rest on testimony and declarations alone. A forensic examination of Prescott and Miller's devices identified at least 37 copies of B&P drawings that remain in their possession. *See* ECF No. 104, PageID.3578. B&P does not pinpoint the devices on which each file was located. Nor does it establish that any of the recovered materials include the specific copyrighted high- and low-speed blade-part drawings at issue here. *See generally* ECF No. 113.

The evidence nonetheless shows that some materials covered by the parties' settlement agreement were retrieved from older emails—many of them document-production communications from prior litigation—stored on Miller's personal iPad and iPhone. ECF No. 104, PageID.3586; *see also* ECF No. 104-14, PageID.3906,

3931–3970. At least some of those drawings appear as embedded exhibits to the transcript of John Kress's deposition from earlier litigation, a transcript Miller had requested from his former counsel. The record further reflects that additional drawings were found in Sarah Bailey's email account and in a messaging application that Prescott used to communicate with customers. *See* ECF Nos. 104-15, PageID.4307–09, 4315–16, 4318; 104-14, PageID.3954–59.

Miller and Bailey offered an account of these materials. Following the execution of the parties' 2022 settlement agreement, Miller enlisted Bailey's assistance to remove covered drawings from Prescott's systems. At that time, Prescott operated with approximately five employees and five computers—four engineering workstations and one assigned to Bailey. Because Bailey did not maintain drawing files on her computer, Miller began by collecting from the engineering workstations files he believed contained covered materials and transferring them to Bailey's machine. Bailey then performed factory resets on the four engineering computers, wiping their hard drives. She subsequently searched the transferred files on her computer for covered drawings, but she did not examine Miller's personal devices, including his iPad and iPhone. Finally, Miller searched for physical files containing covered drawings but found none.

Miller also addressed the materials identified in his emails and the messaging application. He testified that he was unaware that the B&P drawings remained on

- 12 -

his devices, expressed surprise at their presence, and stated that he had never used them. *See* ECF No. 104-14, PageID.4096. In interrogatory responses, he explained that he obtained the Kress deposition transcript from counsel six days after B&P filed its bid protest action in the Court of Federal Claims. He stated that he requested the transcript after identifying what he viewed as extraneous allegations in the complaint—allegations he believed were inconsistent with his recollection of Kress's testimony. Consistent with that account, Prescott intervened in that bid protest. *See B&P Littleford, LLC v. United States, et al.*, Case No. 1:24-cv-00637-LAS (Fed. Ct. Claims 2024). As for the messaging application, Miller testified, with supporting documentation, that a customer sent Prescott a B&P manual without solicitation. He maintains that he did not review any embedded exhibits accompanying the transcript or the documents in those messages.

Bailey provided a similar account regarding the materials found in her email. She testified that, as with the messaging application, customers sent those documents to her without request. And she maintained that Prescott neither solicited the materials nor responded to the emails in which they were transmitted.

The Court conducted a preliminary injunction hearing on April 21, 2026. After the hearing, the Court directed limited supplemental briefing on issues that arose during the hearing. ECF No. 110.

- 13 -

## II.    Legal Standard.

Courts possess the discretion to issue preliminary injunctions. Fed. R. Civ. P. 65(a); *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). A district court may grant a preliminary injunction in the exercise of its equitable discretion. *See* Fed. R. Civ. P. 65(a); *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). But such relief is not routine. A "preliminary injunction is an extraordinary remedy," *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002), and it is "never awarded as of right," *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The party seeking that relief must therefore "make a clear showing" that the circumstances justify it. *Id.*

To justify a preliminary injunction, the movant must establish four familiar factors. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025). It must show that it is likely to succeed on the merits; that it is likely to suffer irreparable harm absent preliminary relief; that the balance of equities tips in its favor; and that an injunction would serve the public interest. *Winter*, 555 U.S. at 20.

District courts must "view and weigh the evidence" in the preliminary record bearing on each factor. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014). In doing so, a court may consider the entire record, including affidavits and declarations. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke*

- 14 -

*Corp.*, 511 F.3d 535, 549 (6th Cir. 2007); *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 555–57 (6th Cir. 2021). And despite Prescott and Miller's argument to the contrary, ECF No. 100, PageID.2676, clear and convincing evidence is not the standard of proof on a preliminary injunction motion. *Fetch! Pet Care, Inc. v. Atomic Pawz Inc.*, 170 F.4th 546, 558 (6th Cir. 2026).

## III.   Analysis.

B&P has not met its burden in justifying a preliminary injunction. It has not established a likelihood of success on the merits. Nor has it shown a likelihood of imminent irreparable harm.

### A.   Likelihood of Success on the Merits.

To obtain its requested injunction, B&P must first show a likelihood of success on either its copyright infringement claim or its contract claim. *See Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 599 F. Supp. 3d 497, 506 (W.D. Ky. 2022) ("The moving party need only show a likelihood of success on the merits on one claim where there are multiple claims at issue in a complaint."). On the preliminary record, B&P has made no showing of a likelihood of success on the merits.

#### 1.   Copyright Infringement Claim.

Congress has conferred "exclusive copyrights to 'original works of authorship fixed in any tangible medium of expression.'" *RJ Control Consultants, Inc. v.*

*Multiject, LLC*, 100 F.4th 659, 666 (6th Cir. 2024) (quoting 17 U.S.C. § 102(a)). But that protection does not extend to every aspect of copyrighted work. A work may contain both protected and unprotected elements, and only the former are within the statute's reach. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). Thus, infringement lies only where a defendant copies those constituent elements that are original to the author. *RJ Control*, 100 F.4th at 667. Here, B&P has not preliminarily established that Prescott and Miller improperly copied the protected elements of its copyrighted blade-part drawings.

### a. Independent Creation Defense.

Up front, Prescott and Miller make a strong showing on their reverse-engineering defense, thus undercutting B&P's likelihood of success on the merits of its copyright claim. This reverse-engineering theory implicates the independent creation doctrine. Under that doctrine, when a defendant shows that it independently created "the allegedly infringing work," that showing "defeats any implicit suggestion of" copyright infringement. *Ellis v. Diffie*, 177 F.3d 503, 507 (6th Cir. 1999). And such a showing is "a complete defense to copyright infringement." *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 887 (7th Cir. 2021) (citation modified); *see also Fogerty v. MGM Grp. Holdings Corp.*, 379 F.3d 348, 352–56 (6th Cir. 2004).

The preliminary record points with considerable force in a single direction:

that Prescott developed its drawings through an independent process of reverse engineering, not by reference to B&P's blade-part drawings. The testimony and declarations of Miller and Bailey, viewed together, describe in consistent terms the method Prescott employed after securing a contract in late 2023 to develop a 150-gallon mixer. Their account is not merely general. Specific details of the reverse-engineering and drafting process accompany it. Several of these details find support elsewhere in the record.

First, Prescott's employees disassembled a 150-gallon vertical mixer that the company lawfully possessed. That step is difficult to reconcile with the notion that Prescott relied on B&P's drawings; one would not expect such an effort if the necessary specifications were already in hand. Bailey, in particular, provided elaborate testimony regarding the disassembly process. And the record reflects that certain disassembled components were sent to a third party for more precise measurements during the period in which Prescott was preparing its drawings—further evidence that Prescott was, in fact, engaged in reverse engineering at the relevant time.

Second, the preliminary record also lacks any indication that Prescott possessed the specific B&P drawings at issue when it created its own. In late 2022, Prescott and Miller destroyed many of the B&P materials in their possession. To be sure, as the forensic turnover revealed, they did not destroy all B&P drawings and

later obtained more, due to what appears on this record to be inadvertence. But B&P has not identified a single B&P blade-part drawing among the materials recovered from the devices it examined. *See generally* ECF No. 113. Nor has it pointed to any evidence suggesting that Prescott had access to such drawings when it produced the challenged materials. That absence is telling. It lends further support to the view that Prescott's drawings were produced through an iterative reverse-engineering process described by Miller and Bailey, rather than by referencing B&P's work.

Third, Prescott and Miller's expert's conclusion bolsters the defense. Their expert concluded their reverse-engineering account was feasible and consistent with industry standards. He emphasized that the industry has used hand tools for precise part measurements for decades, and that Prescott's multiple rework iterations offset any imprecision in the hand tools. Not to mention, B&P's predecessor would have needed to use hand tools to develop the exact product in the 1950s and 60s. The expert also credibly emphasized that the concerns B&P's expert raised about the plausibility of reverse-engineering the mixer blades, such as thermal expansion and wear, were negligible and did not discredit Prescott's account. That is particularly true when Prescott used an iterative rework process, with Miller's decades of knowledge and experience as Prescott's starting point.

Fourth, Prescott altered the blades—and the mixers generally. As Prescott and Miller correctly observe, Prescott and B&P's drawings reflect different blade-head

- 18 -

shapes attributable to keyway location differences between the Prescott and B&P blades. *See* ECF No. 100, PageID.2679–80. Moreover, Prescott modified several other components of the mixer, including eliminating blow-off covers and adding rupture disks, using O-rings rather than paper gaskets, and redesigning the mixer bowl. ECF No. 54-2, PageID.1757. Simply put, these changes are marks of independent creation through reverse engineering.

B&P's counterpoints do not change the calculus. B&P counters by stressing that its expert declared that it would be implausible for the measurements in Prescott's early CAD files to be identical to many in B&P's blade drawings. Yet that declaration rested on an assumption: that he reviewed an early-version Prescott file because it was labeled "v1." Of course, that is a fair assumption. But it is a false assumption. As Bailey's second declaration explains, those files were not early iterations; they were labeled v1 *after* Prescott assigned them a part number only *after* dozens of iterations of the work. The dimensions in the actual first models differ from those featured in B&P's blade drawings. ECF No. 100-9, PageID.3026–27. Moreover, B&P's expert failed to account for Miller's substantial experience and industry knowledge, which would further contribute to the precision of the measurements.

B&P's remaining arguments miss the mark. B&P contends that the independent creation doctrine does not apply "when, as here, the defendant had"

prior "access to the original work." ECF No. 68, PageID.2101. Even assuming, as the Court does below, that B&P satisfies the access requirements as described for infringement claims, this argument lacks merit. Indeed, the Sixth Circuit describes the independent creation doctrine as applying to rebut an inference of infringement "*[o]nce a plaintiff establishes access* and substantial similarity." *Fogerty*, 379 F.3d at 352 (emphasis added). In other words, it applies even when a plaintiff proves prior access to the plaintiff's work.

Finally, B&P argues that the price Prescott charges for 150-gallon mixers does not make sense if Prescott reverse-engineered B&P's product. ECF No. 103, PageID.3568–69. B&P observes that Prescott did not substantially increase its charged price for 150-gallon mixers in anticipation of reverse-engineering costs and speculates that the similar "pricing only makes sense if Prescott had and relied upon B&P's technical drawing." *Id.* at PageID.3569. But one could equally speculate that Prescott did not raise the price to remain competitive and secure contracts for the 150-gallon mixer, assuming the short-term reverse-engineering costs for long-term competitive gains in the market. After all, as the parties explained at the preliminary injunction hearing, the market for vertical mixers features minimal competition. In any event, without more, speculation about pricing does not undercut the ample record evidence supporting Prescott and Miller's reverse-engineering account.

In sum, Prescott and Miller have preliminarily presented "detailed and

specific evidence of independent creation of" Prescott's blade-part drawings. *Ellis*, 177 F.3d at 507. Thus, they have rebutted any inference of copyright infringement and undermined B&P's likelihood of success on its infringement claim. *Id.*

### b.     Viability of Infringement Claim.

Even if Prescott and Miller's independent creation defense did not undermine the infringement claim, B&P has not presented evidence establishing a viable claim. To demonstrate infringement, B&P "must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 536 (6th Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Assuming B&P has established ownership of valid copyrights, the preliminary record does not support B&P's claim on the second element, copying.

A plaintiff can prove "that the original elements of its work were copied through direct or indirect evidence." *Id.* (citing *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (6th Cir. 2004)). B&P proceeds on an indirect evidence theory. B&P's indirect evidence theory requires it to prove two elements: (1) that the alleged infringer had "access" to the allegedly infringing work; and (2) that there are substantial similarities between the "two works at issue." *Id.*

- 21 -

The "access" element bears a technical meaning. It requires the plaintiff to show that the alleged infringer had "an opportunity to view the protected material" before producing the challenged work. *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 277 (6th Cir. 1988); *see also* 4 *Nimmer on Copyright* § 13D.05 (2026); *Ellis*, 177 F.3d at 506; *Fogerty*, 379 F.3d at 353–56. Because Miller had access to the B&P blade-part drawings when he was B&P's CEO, and Prescott and Miller had access to them before destroying them according to the settlement agreement, the Court will assume that B&P satisfies this element.

The substantial similarity element is more complex. Courts employ "a two-step" inquiry "to determine whether disputed works are substantially similar." *Enchant*, 958 F.3d at 537. Courts first must "identify which aspects" of the plaintiff's "works, if any, are protectible by copyright." *Id.* Courts then must "determine whether the allegedly infringing works, or elements of those works, are substantially similar to" the "protected elements of" the plaintiff's work. *Id.* Filtered through that process, Prescott's drawings are not substantially similar to the protected components of B&P's.

B&P's drawings feature scant protectible elements. Unprotected elements are those "that were not independently created by the inventor, and that possess no minimal degree of creativity." *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2003). Elements "that are standard, stock, or common to a particular subject matter or

medium are not protectible under copyright law." *Enchant*, 958 F.3d at 537 (citation modified). Moreover, while "the expression of an idea" is protectable, "mere abstract ideas are not." *Kohus*, 328 F.3d at 855. Further, "in cases like this one, that involve a functional object rather than a creative work, it is necessary to eliminate" the functional elements. *Id.* at 856.

At the outset, it is not entirely clear which features of the blade drawings B&P contends are protected. Its briefing suggests two categories: the underlying technical content and the manner of depiction. As to the first, B&P appears to claim protection over the "technical specifications and component parts" depicted in the drawings. *See* ECF No. 27, PageID.966. It likewise implies that the shapes and designs of the blade components are protectable. ECF No. 103, PageID.3563. As to the second, it points to the drawings' layout—their orientation, arrangement, and use of multiple views. *Id.* at PageID.3562–63.

The first category cannot bear the weight B&P places on it. As Brian Fritz, B&P's Vice President of Engineering, testified in his deposition, the portions of the drawings that include the blade parts and specifications are essentially functional and used for manufacturing purposes. Even where particular blade-part design features are not strictly necessary, they remain inseparable from the utilitarian object itself. Those features are not expressive and therefore not protectable by copyright. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985)

("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

The second category warrants closer attention but largely leads to the same conclusion. Much of the drawings' layout is dictated by practical considerations. As Prescott and Miller's expert notes, many aspects of the drawing layout, such as the horizontal rather than vertical view of the blade, are inherent in the practical realities of the part depicted. ECF No. 100-9, PageID.3034. Those are not protectible components of the drawings. *See Enchant*, 958 F.3d at 538. That choice, in turn, dictates other aspects of the layout. ECF No. 100-9, PageID.3034. But, at the same time, Prescott and Miller's expert agreed with B&P's that no industry standard required the drawings to include the particular multiple views of the blades. *Id.* at PageID.3033. He stated only that it was a common practice to include multiple views of a part on a drawing. *Id.*

Even if B&P's inclusion of multiple views of its blades reflects some protectable expression, Prescott's drawings are not substantially similar in that respect. "Two works are substantially similar when 'they are so alike that the later (unprotected) work can fairly be regarded as appropriating the original expression of the earlier (protected) work.'" *Enchant*, 958 F.3d at 539 (quoting *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 67 (1st Cir. 2009)). Courts assess that question from the perspective of the intended audience—"[n]ormally, . . . the lay public, or

- 24 -

the ordinary reasonable person." *Winfield Collection, Ltd. v. Gemmy Indus., Corp.*, 147 F. App'x 547, 554 (6th Cir. 2005) (citing *Kohus*, 328 F.3d at 857–58).[2]

Here, B&P has not met its burden in showing that the assumed protected elements in the B&P drawings are substantially similar to the corresponding elements in the Prescott drawing. For starters, the challenged Prescott drawings do not include the same number of viewpoints as the B&P's. Indeed, B&P's drawings generally contain many more viewpoints of the parts than Prescott's. *Compare, e.g.*, ECF No. 2-4 *with* ECF No. 2-24. And where the drawings overlap as to which viewpoints of the blade that they depict, Prescott at times depicts more of the part. The differences are not trivial. They preclude a finding that these elements of the drawings are so alike that the Prescott drawings can fairly be regarded as appropriating the original expression of the B&P drawings. As a result, B&P's likelihood of success on the merits of its copyright infringement claim is unlikely.

All in all, B&P has not met its burden in showing a likelihood of success on the merits of its copyright claim. The preliminary record indicates that Prescott and

---

[2] B&P notes that because "the Sixth Circuit has directed district courts to 'consider substantial similarity from the viewpoint of the intended audience,'" in this case, engineers and machinists, the Court should lean on Brian Fritz's perspective as outlined in the verified complaint. ECF No. 27, PageID.966 (quoting *Kohus*, 328 F.3d a 358). While the principle B&P cites is correct, Brian Fritz and the verified complaint consider the similarities of drawings as a whole or their unprotectable elements, rather than focusing only on the protectible elements. *See* ECF No. 2, PageID.177–217. As a result, the provided perspective is incomplete.

Miller developed their drawings independently by reverse-engineering a mixer lawfully in their possession. Even so, B&P has not demonstrated that Prescott's drawings are substantially similar to the protected components of its drawings.

### 2.    Breach of Contract Claim.

Next, B&P has not demonstrated a likelihood of success on its breach-of-contract claim. B&P contends that Prescott and Miller breached the settlement agreement by failing to destroy all B&P drawings within forty-five days of the agreement's effective date and later acquiring B&P blade drawings. While the record supports that argument on the facts, it also undermines it on the law.

Michigan law governs disputes arising out of the settlement agreement. ECF No. 2-2, PageID.250. Under Michigan law, "a party asserting a breach of contract must establish" that (1) "there was a contract," (2) the "other party breached" that contract, and (3) the breach resulted in "damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). But proving those elements does not guarantee success on the merits. Even when a party proves those elements, some defenses render the party's claim nonactionable. *Ehlinger v. Bodi Lake Lumber Co.*, 36 N.W.2d 311, 316 (Mich. 1949).

One such defense is Michigan's first-breach doctrine. *Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994). That doctrine bars "one who first breaches a contract" from suing for another's "subsequent breach or failure to

perform." *Flamm v. Scherer*, 198 N.W.2d 702, 706 (Mich. Ct. App. 1972). Still, the first-breach doctrine has limits. It applies only "if the initial breach was substantial." *Able Demolition v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007). A breach is substantial when it deprives a party of the benefit that it "'reasonably expected to receive.'" *Id.* (quoting *Holtzlander v. Brownell*, 453 N.W.2d 295, 299 (Mich. Ct. App. 1990)).

Prescott and Miller have shown that the first-breach doctrine bars B&P's breach-of-contract claim, undermining B&P's likelihood of success on the merits. The settlement agreement's confidentiality provision—which the parties expressly agreed was a material term—required B&P to remove all postings about the prior litigation from its website within thirty days of the agreement's execution. B&P did not, leaving a 2018 article about the parties' litigation on its website. It therefore breached the contract on day thirty-one, a point that it conceded at the preliminary injunction hearing. Prescott and Miller did not breach the settlement agreement until forty-six days after its execution when they failed to destroy all covered documents in their possession. So B&P's breach came first, rendering its claim for breach of contract nonactionable. *Flamm*, 198 N.W.2d at 706.

B&P's argument to the contrary does not alter the conclusion. B&P contends that failing to remove the 2018 litigation posting from its website did not substantially breach the settlement agreement. In its view, because Miller testified

that it did not affect his or Prescott's ability to fulfill their obligations under the agreement, its breach was merely technical.

But the settlement agreement's plain terms belie that argument. The settlement agreement unambiguously provides that the confidentiality provision is "a material part of" the parties' bargain. ECF No. 2-2, PageID.249. Under Michigan law, courts strictly enforce unambiguous terms to "respect the parties' freedom of contract," even in the first-breach context. *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 547 (Mich. Ct. App. 2007). And where, as B&P did here, a party breaches a term that "is expressly made an essential term of" the contract, it constitutes a substantial breach. *Bd. of Washtenaw Cnty. Rd. Comm'rs v. Lincoln Consol. Sch. Dist.*, No. 304525, 2013 WL 5288915, at *11 (Mich. Ct. App. Sept. 19, 2013); *see also Able Demolition*, 739 N.W.2d at 702 (holding that breaching "an essential term of the contract" constitutes a substantial breach and "not a mere technicality").

### B.   Irreparable Harm.

A lack of a "likelihood of success on the merits is usually fatal" to a preliminary injunction motion. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). That is particularly true "in copyright-infringement actions," where a "failure to establish a likelihood of success deprives" the plaintiff of a "presumption of irreparable harm." *Enchant*, 958 F.3d at 540. And without irreparable harm, a plaintiff cannot obtain a preliminary injunction—full stop. *D.T.*

*v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *EOG Res., Inc.*, 134 F.4th at 885 ("No irreparable harm? No preliminary injunction.").

Here, B&P has not carried its burden to show that, absent preliminary relief, it will suffer irreparable harm while the litigation proceeds. It offers no evidence that Prescott is presently competing against it in any ongoing bids for 150-gallon mixers. Instead, B&P posits that Prescott and Miller are likely to rely on the allegedly infringing blade-part drawings in connection with a prospective bid scheduled for May 2026—one in which B&P expects to participate. *See*, *e.g.*, ECF No. 104-23, PageID.5156–57. On that premise, B&P suggests that the use of such drawings could influence the bid outcome.

That chain of reasoning rests on conjecture. True, historical infringement can establish the likelihood of continued infringement if an infringing party states that it will continue "distributing [works] that are likely infringing," which in turn can establish irreparable harm. *ACT, Inc. v. Worldwide Interactive Network*, Inc., 46 F.4th 489, 504 (6th Cir. 2022). But that is not the case here. As explained above, Prescott's challenged drawings are not likely infringing works. Moreover, Prescott and Miller have not expressed that they intend to use B&P's drawings in any way. And in any event, after the preliminary injunction hearing, Prescott and Miller represented that they are unaware of a 150-gallon mixer bid for May 2026. ECF No. 111, PageID.5371. Even setting that aside, B&P offers no evidence that participation

in the putative bidding process would require the use of the specific allegedly infringing materials in the first place. The asserted harm thus depends on a series of unsupported assumptions. That is not enough: such speculative harm is "insufficient to warrant a preliminary injunction." *Enchant*, 958 F.3d at 540.

In short, B&P has not established that a preliminary injunction is warranted here. Indeed, it has not shown a likelihood of success on the merits or irreparable injury absent a preliminary injunction. Thus, its motion for a preliminary injunction must be denied. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022) ("[W]here there is no likelihood of *either* success on the merits *or* irreparable harm, an injunction is unwarranted—regardless" of "the other factors.").[3]

---

[3] While the lack of a likelihood of success on the merits and irreparable injury preclude preliminary injunctive relief, the other factors would also favor denying B&P's motion. If B&P is granted its broad injunction, it would unduly harm Prescott by hindering Prescott's ability to compete for any bid during this litigation. That harm shows why a preliminary injunction is not in the public interest here: it could curtail competition in defense contracting. Yet the public has a strong interest in free and fair competition in defense contracting, especially when the taxpayer's dollar is at stake. *See, e.g.*, *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 385 (2014). Such a "burden on the public fisc might be justified if the plaintiffs were likely to succeed" on the merits, but because they are not, the burden is not in the public interest. *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 79 (D.D.C. 2000).

## IV.   Conclusion.

Accordingly, it is **ORDERED** that Plaintiff B&P's Motion for a Preliminary

Injunction, ECF Nos. 26; 27, is **DENIED**.

**This is not a final order and does not close this case.**

Dated: April 28, 2026                           s/Robert J. White
                                                Robert J. White
                                                United States District Judge